2026 UT App 32

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MEGGAN RANDALL SUNDWALL,
Appellant.

Opinion
No. 20251352-CA
Filed March 5, 2026

Fourth District Court, Provo Department
The Honorable Sean M. Petersen
No. 251401132

Emily Adams and Scott C. Williams,
Attorneys for Appellant

Derek E. Brown and Lindsay Combs,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1 Meggan Randall Sundwall is charged with aggravated murder and obstruction of justice. The district court bound Sundwall over for trial on those charges and denied her request to be released pending trial, finding that substantial evidence supported the charges and that clear and convincing evidence supported that she was a flight risk. Sundwall appeals, asserting that the court erred in determining that clear and convincing evidence supported its finding that she poses a flight risk. We disagree and affirm.

BACKGROUND[1]

*Sundwall and Kimberly's Relationship*

¶2     Sundwall was working as a registered nurse when she met a woman we refer to pseudonymously as Kimberly. Kimberly was born without a kidney and suffered from chronic kidney disease, endometriosis, hypertension, depression, and anxiety. Kimberly told her family members and others, including Sundwall, that she also had terminal cancer. Sundwall and Kimberly became friends, and Kimberly lived with Sundwall and Sundwall's husband for about two years.

¶3     Over a nearly five-year span, Sundwall and Kimberly texted each other frequently, sending a combined total of 28,880 texts. In 2020, Kimberly texted Sundwall that she was going to name Sundwall as the beneficiary of her life insurance policy. Kimberly explained that Sundwall had "been such a good friend" and had "been taking care of" her and that she "was leaving over a million dollars" to Sundwall.

---

1. This case comes to us on an interlocutory appeal—as authorized by statute, *see* Utah Code § 77-20-209—of the district court's order that Sundwall be detained while she awaits trial or other resolution of the charges against her. "On interlocutory review, we recount the facts as alleged and in a light most favorable to the ruling below," *State v. Taylor*, 2015 UT 42, ¶ 2 n.2, 349 P.3d 696, relying on the information available to the district court when it issued its ruling, including here the evidence presented at the preliminary hearing and the evidence proffered at the detention hearing. Notwithstanding our recitation, however, the facts central to the charges have yet to be ultimately determined, and Sundwall "retains the presumption of innocence that attaches prior to conviction." *State v. Cordova*, 2023 UT App 99, n.1, 536 P.3d 666.

¶4 After this communication, Kimberly's death became a frequent topic of discussion between Sundwall and Kimberly, with Kimberly "repeatedly communicat[ing] a desire to die" and Sundwall "suggest[ing] different ways for [Kimberly] to kill herself." Fairly early on, they discussed the possibility of using insulin to cause Kimberly's death.[2] Sundwall texted that if insulin was used, someone "should stay with [Kimberly] and continue to give [her] doses so . . . [she could] pass" and that the someone "should probably be [Sundwall]." Sundwall also repeatedly sent Kimberly texts like the following: "I'm convinced that you are not going to pass until you actually want to completely. You've asked for blessings, taken stuff, and say you want to, but I know you don't. You have to let go. It is past time."

¶5 At some point, Kimberly told her sister that "she feared for her life" "[b]ecause she wasn't dying fast enough to make [Sundwall] happy." So on a weekend while Sundwall and her husband were away camping, Kimberly's sister and the sister's husband "went and got all of [Kimberly's] stuff" and moved Kimberly into their grandparents' basement. Despite Kimberly's move, Sundwall and Kimberly maintained their friendship and continued communicating.

¶6 In October 2023, Sundwall "and her husband began to have financial problems." Sundwall texted her husband that she would have to keep working nights "unless [Kimberly] passe[d] and [left her] money"; that she was counting "on the thing with [Kimberly] being true to bail [them] out"; and that she was concerned Kimberly was "going to outlive [them] and [they were] going to be in [their] situation forever." Sundwall also told Kimberly about her financial difficulties and said, "If you dying would get me out of this mess, I would take it." Sometime later, Kimberly texted Sundwall, "I would love to die in the next few days because it would make it better for you." Sundwall replied, "You are sweet.

---

2. Kimberly did not have diabetes.

I'd love that too." Sometime in 2024, Sundwall "was fired from her nursing position . . . for falsifying time cards and lying about it."

¶7    On August 12, 2024, Sundwall visited Kimberly at her grandparents' home, arriving at about 10:00 a.m. Sometime earlier that morning, Sundwall had texted Kimberly, "Do you want to take some Promethazine when I get there so that you are asleep when this is happening?" At 1:59 p.m., Sundwall texted her mother from Kimberly's grandparents' home, saying that she could not get Kimberly to wake up. Later in the afternoon, Sundwall contacted her parents again, this time asking her father to come give Kimberly "a blessing of release" "to help her pass peacefully and easier." Sundwall's parents arrived at 8:29 p.m.

¶8    At about 9:00 p.m., Kimberly's uncle, who was also living in Kimberly's grandparents' home, went into the basement to check on Kimberly. He found Sundwall and Sundwall's parents gathered around Kimberly's bed. Kimberly was lying on the bed "making some funny noises" "like she was drowning," and she "wasn't responding." When the uncle asked Sundwall "how long [Kimberly] had been like that," Sundwall said, "[A] couple of hours." Sundwall told the uncle not to call an ambulance because Kimberly had a "do not resuscitate" form (DNR) and did not want to go to the hospital. Sundwall later told a detective that she "had power of attorney over [Kimberly's] medical decisions."

¶9    Kimberly's uncle called Kimberly's sister, who urged him to call 911, which he did. Sundwall and her parents left as paramedics arrived. The paramedics found a "diabetic needle" in Kimberly's room near the chair where Sundwall had been sitting. They took Kimberly to the hospital, where her blood sugar level was measured at 14. A level under 40 can be life-threatening, and when "someone who's not a diabetic [has] a blood sugar [level] of 14," "it's probably [the result of] exogenous insulin," meaning

insulin administered from outside the body. Kimberly never regained consciousness and died three days later.

¶10    Following Kimberly's death, no DNR was ever found and Sundwall never produced any document showing she had power of attorney over Kimberly's medical decisions. Law enforcement officers learned and informed Sundwall that Kimberly had no life insurance policy and that Kimberly never had cancer. Officers asked Sundwall for consent to search her phone. Sundwall agreed but did not immediately provide her phone. After Sundwall provided her phone, officers compared the text messages on Sundwall's phone with those on Kimberly's phone from a three-week period and discovered that Sundwall had selectively deleted from her phone 283 text messages from that period "that talked about insulin, . . . finances, . . . life insurance and suicide."

¶11    Sundwall was arrested, charged with aggravated murder and obstruction of justice, and ordered to be held without bail. A representative of the Division of Professional Licensing "came to the jail and suspended [Sundwall's] nursing license, cutting off her career path and income." Sundwall's husband began attempting to sell their home and car, and Sundwall's parents borrowed $30,000 against their home to retain private counsel to represent Sundwall through her preliminary hearing. Sundwall worked with a friend to "launch a GoFundMe campaign, despite that platform having rules that explicitly bar fundraising for violent crime defendants." Sundwall "intend[ed] to ask [her attorney] to rewrite the campaign to evade detection."

¶12    Following a preliminary hearing, the district court found probable cause to bind Sundwall over for trial on both the aggravated murder charge and the obstruction of justice charge. The State then filed notice that it did not intend to seek the death penalty, thereby allowing the court to "address any requests for bail." *See generally* Utah Code § 77-20-201(1)(a), (3)(a) (providing that a person charged with a capital felony is not entitled to bail

but that if "the prosecuting attorney files a notice of intent to not seek the death penalty," a charge of aggravated murder is not a capital felony). The court then set a detention hearing to determine whether Sundwall should be granted pretrial release or continue to be held without bail.

¶13    After receiving evidentiary proffers and arguments at the detention hearing, the court issued an order denying Sundwall pretrial release. The court found that there was substantial evidence to support the charges, and it found "by clear and convincing evidence that [Sundwall was] likely to flee the jurisdiction of the court if [she was] released on bail." In support of this latter finding, the court explained as follows:

> [T]he [c]ourt viewed texts as to [Sundwall's] many concerns about her current financial situation and mental state and the need for a payout to get out of her current financial situation.
>
> Of great concern to the [c]ourt is evidence that [Sundwall's] current financial situation has not surprisingly improved, but actually worsened, including a loss of a job, the sale of or potential need to sell her home, along with concerns of . . . an ongoing ability to pay retained counsel.
>
> The [c]ourt is aware of a large amount of support for [Sundwall] from her friends and family. . . .
>
> The [c]ourt also notes [defense counsel's] argument that this case presents, in his words, remarkable circumstances where release could be appropriate. . . .
>
> Notwithstanding this support and argument, the [c]ourt likens [Sundwall's] current situation to

being backed into a corner more or less with nothing to lose based upon her current status.

When someone has nothing to lose, it oftentimes results in drastic decisions being made. And that is a foremost concern of the [c]ourt.

Potential life in prison, along with the [c]ourt's understanding and consideration of [Sundwall's] current financial situation, mental state, and facts showing a years-long relationship that ended in the death of someone, give the [c]ourt extreme pause when considering [Sundwall's] likelihood of showing up to court.

¶14 Having found substantial evidence to support the charges and clear and convincing evidence that Sundwall posed a flight risk, the court denied Sundwall's request for pretrial release. Sundwall now appeals that ruling.

ISSUE AND STANDARD OF REVIEW

¶15 Sundwall asserts that the district court's finding by clear and convincing evidence that she was a flight risk is clearly erroneous. "A district court's determination that there is clear and convincing evidence that the defendant is . . . likely to flee if released is a fact-intensive, credibility-assessment-dependent inquiry that deserves deference. We reverse that determination only if it is clearly erroneous." *Randolph v. State*, 2022 UT 34, ¶ 49, 515 P.3d 444; *accord State v. Cordova*, 2023 UT App 99, ¶ 6, 536 P.3d 666. Under the clearly erroneous standard, "we must sustain the [district] court's judgment unless it is against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *State v. Briggs*, 2008 UT 75, ¶ 10, 197 P.3d 628 (cleaned up). "Additionally, in those instances in which the [district] court's findings include inferences

drawn from the evidence, we will not take issue with those inferences unless the logic upon which their extrapolation from the evidence is based is so flawed as to render the inference clearly erroneous." *Id.* ¶ 11 (cleaned up).

## ANALYSIS

¶16 Under the Utah Constitution, criminal defendants are generally entitled to pretrial release. *See* Utah Const. art. 1, § 8. One exception to that general rule is where (1) the defendant is charged with a felony, (2) "there is substantial evidence to support the charge," and (3) "the court finds, by clear and convincing evidence, that . . . the individual is likely to flee the jurisdiction of the court if the individual is released on bail." Utah Code § 77-20-201(c)(ii).

¶17 When "making a determination about pretrial release," the district court may "rely upon information contained in" any of the following:

> (i) the indictment or information; (ii) any sworn or probable cause statement or other information provided by law enforcement; (iii) a pretrial risk assessment; (iv) an affidavit of indigency described in Section 78B-22-201.5; (v) witness statements or testimony; (vi) the results of a lethality assessment completed in accordance with Section 77-36-2.1; or (vii) any other reliable record or source, including proffered evidence.

*Id.* § 77-20-205(8)(a). Additionally, the court may consider, among other things, "the nature and circumstances of the offense, or offenses, that the individual was arrested for, or charged with"; the individual's "character," "physical and mental health," "employment status or history," "financial resources," and "past criminal conduct"; and any "other evidence relevant to the

individual's likelihood of fleeing . . . if released." *Id.* § 77-20-205(8)(b). If the court determines that pretrial release should not be granted, the court must "make sufficiently detailed findings of fact on the risk of . . . flight from the court's jurisdiction to enable a reviewing court to ensure that the [court's] determination reasonably considered all of the evidence presented to the court." *Id.* § 77-20-205(10). The court "may not base a determination about pretrial release solely . . . on the seriousness or type of offense that the individual is arrested for or charged with, unless the individual is arrested for or charged with a capital felony." *Id.* § 77-20-205(9). "[A]ny arrest or charge for . . . aggravated murder[] is a capital felony unless . . . the prosecuting attorney files a notice of intent to not seek the death penalty." *Id.* § 77-20-201(3)(a).[3] Here the State filed such a notice, making the aggravated murder charge against Sundwall a non-capital felony for purposes of pretrial release.

¶18    As noted, the district court found that there was clear and convincing evidence that Sundwall was a flight risk, and it denied

---

3. By its terms, the provision in Utah Code subsection 77-20-201(3)(a), regarding when a charge of aggravated murder qualifies as a capital offense, applies specifically to subsection 77-20-201(1)(a), which states, "An individual charged with, or arrested for, a criminal offense shall be admitted to bail as a matter of right, except if the individual is charged with . . . a capital felony when there is substantial evidence to support the charge . . . ." As a corollary, subsection 77-20-205(9)(a) states, "The [court] may not base a determination about pretrial release solely . . . on the seriousness or type of offense that the individual is arrested for or charged with, unless the individual is arrested for or charged with a capital felony . . . ." Because of the plain relationship between subsection 77-20-201(1)(a) and subsection 77-20-205(9)(a), we conclude that subsection 77-20-201(3)(a)'s provision regarding when aggravated murder qualifies as a capital offense applies to subsection 77-20-205(9)(a) and subsection 77-20-201(1)(a).

her pretrial release on that basis. "The clear and convincing standard implies something more than the preponderance, or greater weight, of the evidence[] and something less than proof beyond a reasonable doubt. It demands the introduction of evidence that makes the existence of the disputed facts very highly probable." *Randolph v. State*, 2022 UT 34, ¶ 84, 515 P.3d 444 (cleaned up). "Though we are not unmindful of the 'clear and convincing' burden of proof below, that burden does not alter, nor is it inconsistent with, the 'clearly erroneous' standard of review on appeal." *In re R.R.D.*, 791 P.2d 206, 208 n.3 (Utah Ct. App. 1990).

¶19 The district court "liken[ed] [Sundwall's] current situation to being backed into a corner more or less with nothing to lose." It stated that its "foremost concern" was that "[w]hen someone has nothing to lose, it oftentimes results in drastic decisions being made." On this basis, the court found "by clear and convincing evidence that [Sundwall was] likely to flee the jurisdiction of the court if [she was] released on bail."

¶20 The district court made that finding based on the totality of the evidence and information presented in the moving papers, the preliminary hearing, and the detention hearing. That evidence and information—when viewed in the light most favorable to the court's ultimate finding—demonstrated the following:

- After Sundwall and her husband began experiencing financial problems, she falsified time cards at her place of employment and lied about it.

- Substantial evidence suggests that when Sundwall continued to experience financial difficulties, she killed Kimberly, hoping to receive life insurance proceeds.

- When Kimberly's uncle suggested emergency medical help for Kimberly, Sundwall lied about Kimberly having a DNR.

- Later, as officers began to investigate Kimberly's death, Sundwall lied about having a power of attorney over Kimberly's medical decisions.

- Substantial evidence suggests that as officers began focusing their investigation on Sundwall, she illegally deleted at least 283 incriminating text messages from her phone.

- And when the cost of private counsel became apparent, Sundwall sought to circumvent crowdfunding rules, with an intent to involve her attorney in that wrongdoing.

In sum, the evidence and information before the district court demonstrated a repeated pattern of Sundwall resorting to unlawful or otherwise impermissible behavior when backed into a corner.

¶21 The evidence and information before the court also showed that Sundwall was again in desperate straits due to financial strain beyond what she experienced previously and the prospect of receiving a sentence of life in prison without the possibility of parole. Given Sundwall's demonstrated pattern of unlawful and impermissible behavior when she is backed into a corner and the fact that she was now backed into a more desperate corner than ever before, the district court could reasonably infer that Sundwall was likely to engage in the unlawful behavior of fleeing the jurisdiction of the court if she was released on bail. Accordingly, the court's finding by clear and convincing evidence that Sundwall was a flight risk is not clearly erroneous.

## CONCLUSION

¶22 The district court's finding by clear and convincing evidence that Sundwall was a flight risk is not clearly erroneous.

We therefore affirm the court's decision to deny Sundwall's request for pretrial release.

_____